UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | Case No. 1:10-cr-5 |
| v. | ) | |
| | ) | *Mattice / Lee* |
| JONATHAN ALLEN and | ) | |
| TERENCE CRAWLEY | ) | |

## REPORT AND RECOMMENDATION

Before the Court are the motions of Defendants Jonathan Allen ("Allen") and Terence Crawley ("Crawley"), collectively "Defendants," to suppress evidence of a bank robbery found during a traffic stop [Doc. 21, 27].[1] Defendants argue for suppression on three grounds: (1) there was no proper basis for the traffic stop, (2) the stop was unreasonably prolonged, and (3) the search of the car exceeded the scope of the limited consent given by Crawley. After considering the testimony and the parties' arguments, I find no constitutional violation, and I **RECOMMEND** that Defendants' motions to suppress [Doc. 21, 27] be **DENIED**.

## I. BACKGROUND

At the hearing, the Government offered the testimony of Virginia State Police ("VSP") Trooper Oris Lilly ("Lilly"). Trooper Lilly testified as follows: A little before 5:00 p.m. on January 4, 2010, Lilly was parked in the median on Interstate 81, several miles south of Wytheville, Virginia, facing south to observe the cars approaching in the northbound lanes of I-81. Lilly stated that in his

---

[1] The motions were referred for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) [Doc. 24, 28]. The Government filed responsive briefs [Doc. 26, 33] and Crawley filed a reply to the Government's response [Doc. 32]. An evidentiary hearing was held on May 14, 2010, and the parties submitted post-hearing briefs [Doc. 38, 39, 40]. The matter is now ripe for decision.

experience, I-81 is a corridor for drug trafficking, with drugs going north and money going south. Lilly observed a dark car which appeared to have an expired 2009 Virginia inspection sticker on the front windshield. Lilly testified that enforcement of inspection sticker requirements is one of his "fortés"; he explained that the 2009 sticker was green, but the 2010 sticker is yellow. There was only one sticker on the windshield. The car did not have a front license plate, as is required in Virginia. The car was traveling at approximately the posted speed of 65 miles per hour, but Lilly did not confirm its speed with radar. As the car passed, Lilly observed that its rear license plate was white, suggesting it could have been registered either in Virginia or Maryland.

Lilly pulled out to follow the car, and as he did so, the car moved from the left to the right lane. Lilly caught up with the car within about four tenths of a mile. As the car approached the first Wytheville exit, the car moved at the last moment into the deceleration lane to exit. The exit did not have a northbound reentry, which was posted on a highway sign. There were no signs indicating gasoline was available at that exit. Lilly, too, exited to follow. On the ramp, Lilly observed the vehicle's sunroof was open; an occupant of the car was smoking and flipping ashes out of the sunroof. Lilly noticed this because it was cold out--perhaps 10 to 15 degrees. The car hesitated when it approached the stop sign at the end of the ramp as if the driver was unsure which way to go. The car turned north onto U.S. Highway 11, a four-lane highway with a posted speed limit of 55 miles per hour, about four miles south of downtown Wytheville. Lilly again followed.

Defendants' car proceeded north on Highway 11 in the rightmost lane. Lilly followed slightly behind, but in the left northbound lane. The posted speed limit changed to 45 miles per hour, and then 35, and the car adjusted its speed to match each time. There were two men in the car, later determined to be Allen, the driver, and Crawley, the passenger. Both were looking straight

2

ahead. About five miles after Lilly had begun following Defendants, at approximately 4:45 p.m., Defendants turned into a long parking lot for a restaurant called CJ's Pizza. The car did not use a signal. There were no other cars behind Defendants in the right lane, and Lilly was able to cut across the right lane from the left to follow Defendants into the parking lot. As Defendants pulled into a parking spot in front of CJ's Pizza, Lilly activated his blue lights and pulled in behind them. A car was waiting to exit the same parking lot about 40 feet north of where Defendants entered it. The parking lot was some 250 to 300 feet long with no specific entrance/exit, and cars could pull in and out anywhere along the front of the lot. Lilly stated the car waiting to exit "may have been affected by the maneuver," but no other cars could have been affected.[2] Lilly admitted he had observed no traffic infractions other than the failure to signal.

Lilly approached the driver's side of the car, but the driver's window was not functioning. Allen opened the door to speak to Lilly. When Allen opened the door, Lilly noticed a screwdriver between the door and the driver's seat. Lilly explained that he had failed to use a turn signal and Allen admitted he failed to use a signal by saying, "my bad." Lilly then explained he followed the car because they had an expired inspection tag and no front license plate. Crawley, from the passenger side of the car, told Lilly that it had been knocked off during a snowstorm. Lilly obtained the occupants' identification and registration and learned Crawley owned the car. Lilly asked why the men had exited, and Allen mentioned they needed gas. During Lilly's encounter with Defendants, the men hesitated and looked at each other before answering, and Crawley answered questions directed to Allen. Allen seemed "over-nervous" to Lilly, which raised Lilly's suspicion

---

[2] Earlier in the hearing, when asked whether the car waiting to pull out had in fact been affected by Defendants' turn, Lilly responded, "Not that day, no."

to the "next level."

Lilly, who is a resident of Wytheville, was also suspicious because he knew there was no gas station at the exit taken by the Defendants, there was no sign posted on the highway that gas stations were available at the exit, the men would have had to travel at least four miles before reaching a gas station from an exit without reentry, and there was no gas station at the parking lot where the Defendants stopped. Lilly glanced at the gas gauge to see if fuel was needed, and noticed that the electronic gauges on the car's dashboard were not displayed, so Lilly thought they were not working. Lilly admitted on cross examination that Allen had been able to keep the car at the various posted speed limits, which would be difficult without a working speedometer. Lilly was suspicious that the screwdriver, the non-functioning window, and the dashboard gauges were symptomatic of an electrical problem which in his experience might indicate the vehicle had a hidden compartment.

About three or four minutes into the stop, Lilly returned to his patrol car and requested a records check on Defendants from the VSP dispatch. The records check revealed their licenses and car registration were valid, that Crawley was wanted in Georgia for a weapons charge on an active "no extradition" warrant and had previous incidents of "false information" and "possibly escape," and that Allen had a previous drug charge and a flight charge. Lilly did not intend to arrest Crawley pursuant to the no extradition warrant because it was "limited to Georgia." Lilly did not know whether the charges reported by the dispatcher had resulted in convictions. Because the men had criminal records, Lilly was concerned for his safety and he requested backup from dispatch.

While waiting for his backup, Lilly then began to write up summonses for two traffic

infractions: the failure to signal and a worn/slick tire he had noticed while talking to Defendants.[3] A backup officer arrived two to three minutes later but stayed in his patrol car after Lilly motioned for him to stay put. When the first backup officer arrived, Lilly estimated the stop had been ongoing for about ten minutes.

Shortly after the first back up officer arrived, Lilly returned to the driver's side of Defendants' car to talk to both men again. He asked where they had been and where they were headed. They responded they had been on a fishing trip and were headed to Maryland. Lilly, who is a fisherman, found this surprising because it had been so cold, and the ponds and lakes of Virginia were frozen over. Crawley was still doing all the talking, and he said they had been fishing on a big lake, but he could not recall the name of the lake. There were fishing poles in the backseat. At least one had been strung with line, but Lilly could not tell whether they had been used. Crawley said that Allen was not much of a fisherman and had been complaining of the cold. When asked, Crawley stated he did not have a fishing license. Allen volunteered he had a fishing license, but could not produce it.

Because their story did not "add up," Lilly decided to separate the men and question them further. Lilly asked Crawley to step out of the car to talk and to let him know about the no extradition warrant. Because it was cold, he asked Crawley to accompany him to his warm patrol car, and Crawley complied. Lilly asked Crawley if he was aware of the warrant. Crawley was quick to explain that it was a matter of mistaken identity and he had "had this problem before." Lilly asked more specific questions about the fishing trip. When asked again where they fished, Crawley

---

[3] The summonses were admitted without objection as Defense Exhibits 2 and 3.

said they stopped whenever they saw creeks while driving. Lilly asked how long the trip had been, and Crawley told him four days, and that they had driven down to Raleigh, North Carolina, on New Year's Day. Crawley said they spent the first night with Allen's relatives in Raleigh, but he did not know their names. Crawley could not say where they spent the second night of the trip. The previous night, Crawley stated they "partied" with some girls and stayed at an Econolodge motel.

Lilly then left Crawley sitting in the patrol car and went to ask Allen the same set of questions. Allen told Lilly they had started their trip on New Year's Eve and stayed in North Carolina with his family. Lilly asked their names, but Allen did not answer or make eye contact; he just looked forward. Similarly, he did not answer when asked where they stayed the second night. The previous night, Allen stated the men had partied with some girls and stayed at a motel. He could not remember, but thought it was a Best Western.

Suspicious of criminal activity, Lilly decided to issue the summonses for Allen that he had already begun writing and returned to his patrol car to finish the summonses. Lilly returned Crawley's license and registration to him and told Crawley he was "personally" free to go. Crawley did not exit the car, so Lilly again engaged him in conversation. He asked whether there was any contraband in the car, and Crawley answered in the negative. When Crawley was quick to respond that there was nothing illegal in the car, Lilly asked for permission to search, and Crawley stated, "you can search the inside of my car." Lilly took this to mean that he could search only the passenger compartment but not under the hood or in the trunk. At that point, about 30 minutes had elapsed since the stop began. Crawley remarked that he wanted a cigarette, and Lilly told him again that he was free to go. Lilly admitted that Crawley would not have been able to leave in the car because it was blocked by the patrol car. As Crawley and Lilly exited the parol car, Trooper Russell

6

Edwards ("Edwards"), Lilly's shift partner, arrived at the scene.[4]

Lilly returned again to Defendants' car and told Allen he had two summonses to issue. He then asked Allen to step out of the car while he explained the summonses. Lilly informed Allen that Crawley had given permission to search the car. Allen turned and looked at Crawley, but said nothing. At that point, Lilly had completed the purposes of the traffic stop. The time "4:50" is written on both summonses, but they were not issued at 4:50. They were issued after Lilly obtained Crawley's consent, about 30 minutes after the stop began. A "normal" traffic stop for failure to signal would take only about ten minutes.

After the summonses were issued, another officer ran a drug dog around the car, but the dog did not alert. Lilly and Edwards began their search, Lilly on the driver's side and Edwards on the passenger's side. Under the driver's floor mat, Lilly found a Maryland tag matching the one on the rear of the car. It did not look as though it had been knocked off in a snowstorm. Allen was fidgeting and complaining of being cold. He seemed aggravated, and told the officers they were not going to find anything. At no time, however, was Crawley's consent for a search of the inside of the car revoked.

During the search of the inside of the vehicle, Lilly noticed a strip of gray vinyl at the base of the driver's door that was unlike the carpeted panel on the other door. Again, Lilly believed this to be consistent with the presence of a hidden compartment.[5] In the backseat, Lilly found empty

---

[4] Edwards' car was equipped with a video recorder, which recorded the search of Defendants' vehicle, but the video has since been "lost" and was not presented in evidence. Lilly's patrol car was not equipped with recording equipment.

[5] Later, it was determined to be an empty hidden compartment.

Airsoft pellet gun boxes and the fishing poles (two of which were brand new and still had plastic and the pricetag on the handle). No longer than five minutes into the search, Edwards found a handrolled cigarette. Edwards held it up and asked, "whose roach is this?" Allen did not say anything, but Crawley said it must have belonged to his father, who had glaucoma. Lilly believed it was marijuana base on his visual observation and Crawley's glaucoma response. The cigarette was not tested by VSP, however, and Lilly could not testify definitively that it was marijuana.

At that point, Lilly believed he had probable cause to search the entire vehicle. He removed the key from the ignition and opened the trunk. In the trunk were two Airsoft pistols and an Airsoft sawed-off shotgun. Lilly also found a black backpack filled with a large amount of U.S. currency, stacked loosely. Lilly estimated the backpack contained about $100,000, but it ultimately turned out to be about $69,000. Both Defendants were immediately arrested at gunpoint, handcuffed, and told their *Miranda* rights. Crawley agreed to talk and stated he did not know about the money. Allen said nothing. Edwards then found two handguns in a void after pulling up the carpet of the trunk. Another search of the passenger compartment then revealed a bulletproof vest under the passenger's floor mat. The vest had been shot six times in the back. After the stop, Defendants' car was locked up in an impound lot. Lilly stated it was safe to assume there were no changes to its contents or condition while it was impounded.

The Government also offered Edwards' testimony and he testified that he found a marijuana cigarette in the ashtray of the rear door. Edwards was 100% certain it was marijuana because he sniffed it and it smelled like marijuana. Edwards stated he held the joint up and asked whose it was, and one of the Defendants said it was his father's.

The defense offered the testimony of Marian Jeannelle Nelson ("Nelson"), Crawley's

8

mother. She testified that she and another of her sons retrieved Crawley's car from the impound lot. She testified that the car was not altered and its contents were not disturbed after they brought it home. She initially recalled only one fishing pole in the car. The defense offered three photographs into evidence, one of the dashboard, which appears to be functioning properly,[6] and two of fishing rods, none of which, according to Nelson, were wrapped in paper or plastic.[7]

I **FIND** Lilly's testimony to be credible. While credible, Lilly's testimony was not uncontested. For instance, Lilly testified that he thought the electronic dash was not "displayed" at the time he initially peered in, which he thought was also suggestive of an electrical problem given the inoperable window and screwdriver. Nelson stated she believed the gauges were operable when she retrieved the car. Based on the driver's ability to maintain correct speeds through multiple speed changes, it appears reasonable that the speedometer was working at the time of the stop. Another difference between Lilly's and Nelson's testimony concerns the fishing poles. With respect to the fishing poles, Nelson's testimony was, at least initially, inconsistent with the number of poles in the car as she only recalled one fishing pole until shown the photographs. More importantly, when Lilly initially observed the fishing poles in the backseat, he was unsure whether they had been used, and believed only one of them was strung with line. Only later, when he searched the car's interior, did Lilly see the packaging on the fishing pole. At that point, however, Lilly had already compared the two versions of the fishing trip story and had concluded they were suspiciously dissimilar. Lilly did not contend that his suspicions about the fishing trip alone, whether from the dissimilar stories or

---

[6] The photograph was admitted as Defense Exhibit 6. Notably, the gas gauge is not visible in the photograph.

[7] The photographs were admitted as Defense Exhibits 7 and 8.

9

the packaging on the poles, gave him probable cause to search the trunk. Instead, he testified that probable cause, in his opinion, arose when they found the roach. The discrepancies in these details are not significant enough to cause me to reject Lilly's credible testimony about his observations related to the bases for the stop, the detention, and the search.

## II. ANALYSIS

As previously noted, Defendants seek to suppress the items found during the search, arguing that the initial traffic stop was unlawful, that the detention was prolonged after the citations were issued without reasonable suspicion, and that the search of the trunk exceeded the bounds of Crawley's consent to search the "inside" of the vehicle.

### A. The Initial Stop

A traffic stop is a seizure of both the driver and any passengers in the vehicle, *see Brendlin v. California*, 551 U.S. 249, 256-57 (2007); *United States v. Jones*, 562 F.3d 768, 774 (6th Cir. 2009), and any evidence seized during an unlawful traffic stop must be suppressed, *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008). The United States Court of Appeals for the Sixth Circuit ("Sixth Circuit") "has developed two separate tests to determine the constitutional validity of vehicle stops: an officer must have probable cause to make a stop for a civil infraction, and reasonable suspicion of an ongoing crime to make a stop for a criminal violation." *Blair*, 524 F.3d at 748. Because the officers seized the evidence without a warrant, the burden of proof rests on the Government to show that the seizure was lawful. *United States v. Herndon*, 501 F.3d 683, 692 (6th Cir. 2007) ("The government has the burden of proving the legality of a warrantless search.").

The Government argues Lilly had probable cause to believe a traffic violation had occurred-- namely, failure to signal as proscribed by Va. Code § 46.2-848, which provides:

> Every driver who intends to back, stop, turn, or partly turn from a direct line shall first see that such movement can be made safely and, *whenever the operation of any other vehicle may be affected by such movement*, shall give the signals required in this article, plainly visible to the driver of such other vehicle, of his intention to make such movement.

(emphasis added).

As argued by Defendants, Lilly had no basis for the stop unless he had probable cause to believe Va. Code § 46.2-848 was violated. The parties appear to disagree about what must be shown to constitute a violation of Va. Code § 46.2-848 (may be affected versus would be affected), but I **CONCLUDE** Trooper Lilly had probable cause to believe Va. Code § 46.2-848 had been violated.[8]

"Probable cause is satisfied when the facts and circumstances within the officer's knowledge, based on reasonably trustworthy information, are sufficient to warrant a man of reasonable caution to believe that an offense has been or is being committed." *United States v. Bonilla*, 357 F. App'x 693, 695 (6th Cir. 2009). Probable cause deals with *probabilities*; it does not require evidence sufficient to establish a prima facie case that a particular law has been violated. *United States v. Jackson*, 470 F.3d 299, 306 (6th Cir. 2006). The relevant inquiry is whether the facts known to Lilly supported a "reasonabl[e] belie[f] that the driver of the car [wa]s doing something that represent[ed] a violation of the law." *United States v. Hughes*, 2010 WL 2104237, at *3 (6th Cir. 2010).

Here, Lilly personally observed Allen make an abrupt turn into a parking lot without

---

[8] The parties appear to agree that the worn/slick tire violation does not support the traffic stop, nor could it given that Lilly did not observe the tire infraction until after the stop was made. *See United States v. Hughes*, 2010 WL 2104237, at *3 (6th Cir. 2010) ("[P]olice officers may not look for after-the-fact justifications for stops . . . ."). Citing *United States v. Sanford*, 476 F.3d 391, 396 (6th Cir. 2007), the Government also argues that the stop was proper if it was supported by reasonable suspicion, not probable cause. Because I conclude the stop was supported by the higher probable cause standard, I need not reach any issue regarding whether reasonable suspicion alone would be sufficient to support the stop.

11

signaling while another car waited to turn out. Whether or not the other car was affected in hindsight, there was a fair probability that when Lilly observed the turn it *may* have been affected, which is all the statute requires. Other courts addressing this question have reached similar conclusions. In *United States v. Agee*, the Fourth Circuit Court of Appeals held that "[b]ecause the evidence [was] uncontroverted that there were other vehicles in the area of Agee's unannounced right turn, including the officer's squad car, there existed at least the probability that one of them 'm[ight have been] affected' by Agee's turn." 1999 WL 11286, at *2 (4th Cir. 1999) (per curiam table decision) (original alterations omitted). *See also United States v. Harvey*, 269 F. App'x 329 (4th Cir. 2008) (reaching the same result on similar facts); *United States v. Brown*, 2009 WL 3335111 (E.D. Va. 2009); *United States v. Carter*, 2007 WL 1052592 (E.D. Va. 2007). *Cf. United States v. Bias*, 2008 WL 4683217, at *3 (E.D. Tenn. 2008) (concluding, under a similar Tennessee statute, that there is probable cause to believe that other drivers "may be affected" by a failure to signal whenever "other drivers were present on the road *or attempting to enter the road*") (emphasis added).

Defendants suggest that Lilly manufactured a reason to stop their car. To the extent they are suggesting that Lilly fabricated the existence of a vehicle waiting to exit the lot that may have been affected by the un-signaled turn, they failed to present any evidence to counter Lilly's credible testimony about the exiting vehicle. To the extent they are merely suggesting Lilly's subjective intent was to investigate suspicions unrelated to the traffic stop, Lilly's subjective intent is irrelevant under applicable precedent. *See United States v. Hill*, 195 F.3d 258, 270-71 (6th Cir. 1995) ("[A]n officer may stop a vehicle for a traffic violation when his true motivation is to search for contraband, as long as the officer had probable cause to initially stop the vehicle.") (citing *Whren v. United*

*States*, 517 U.S. 806, 812-13 (1996)); *Hughes*, 2010 WL 2104237, at *2 (rejecting the district court's analysis of why the officer "*really*" stopped the vehicle) *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993) (holding that "so long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful"). Accordingly, I **CONCLUDE** the initial stop of Defendants was lawful.

### B. Length of the Detention

Although Lilly was justified in stopping Defendants for failure to signal, a traffic stop that is lawful at its inception may nonetheless violate the Fourth Amendment if it is not properly limited in scope and duration. *United States v. Everett*, 601 F.3d 484, 488 (6th Cir. 2010). The reasonableness of both the scope and duration of a traffic stop is controlled by the quantum of articulable suspicion supporting the stop: "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time," and the stop "must last no longer than is necessary to effectuate the purpose of the stop." *Id.* at 488-89 (internal quotations and alterations omitted). If a stop is unreasonably prolonged, "valid consent can no longer be obtained." *United States v. Erwin*, 155 F.3d 818, 823 (6th Cir. 1998).

The Sixth Circuit recently explained that there are two species of "prolongation" cases--those in which the purposes of the initial stop have actually been completed, in which case any *subsequent* detention is impermissible without independent reasonable suspicion, and those in which there is some prolongation *before* the stop is completed because the officer is pursuing parallel investigative purposes unrelated to the traffic violation. *Everett*, 601 F.3d at 492 n.9. In the latter case, the officer may pursue those other avenues of investigation so long as the detention is not "measurably" prolonged beyond the time necessary to complete the purposes of the stop. *Arizona v. Johnson*, 129

S. Ct. 781, 788 (2009).

If there is "dead time" while the officer or her partner is completing a task related to the traffic violation, the officer may ask unrelated questions without fear of prolonging the stop. *See Everett*, 601 F.3d at 492. Furthermore, even if the stop is prolonged, the extended detention will not necessarily be unreasonable. *Id.* at 493. "[S]ome" prolongation, however, becomes "too much" when the "'totality of the circumstances surrounding the stop' indicates that the duration of *the stop as a whole*--including any prolongation due to suspicionless unrelated questioning--was [un]reasonable." *Id.* at 493-94 (citing cases from other circuits in which delays between 25 seconds and five minutes were approved as not measurably extending the stop and a contrasting case in which a delay of 13 minutes was held to be unreasonable, but declining to adopt a bright-line test).

The "overarching consideration" in this inquiry is the officer's "diligence" in (a) "ascertaining whether the suspected traffic violation occurred" and (b) "if necessary, issuing a ticket." *Id.* at 494. "[C]ontext-framing" inquiries related to the driver's travel history and travel plans or his authority to operate the vehicle "will rarely suggest a lack of diligence." *Id.* Similarly, inquiring whether the driver possesses a weapon "do[es] not bespeak a lack of diligence." *Id.* at 495. In contrast, if the officer "definitively abandon[s] the prosecution of the traffic stop and embark[s] on another sustained course of investigation, this . . . surely bespeak[s] a lack of diligence." *Id.* In such a case, of course, the detention is unreasonable unless the other sustained course of investigation is supported by independent reasonable suspicion. *See id.* at 488 n.4, 495. "Abandonment" in this context is not a subjective inquiry: "continuing to detain a motorist does not become unlawful just because the officer has determined in his own mind not to pursue the traffic violation" or because no citation is ultimately issued. *United States v. Herbin*, 343 F.3d 807, 810

14

(6th Cir. 2003).[9]

In summary, *Everett* establishes a simple framework for prolongation cases: if the traffic stop is "completed" or "definitively abandon[ed]," the officer must have independent reasonable suspicion supporting any further detention at the moment of completion or abandonment. *See United States v. Urrieta*, 520 F.3d 569, 574 (6th Cir. 2008). On the other hand, if the officer continues to pursue the purposes of the original traffic stop throughout the encounter, a reviewing court must examine the totality of the circumstances to determine whether the duration of the stop as a whole, with due consideration to the time spent on unrelated inquiries (such as questioning or dog sniffs), was reasonable--in other words, whether the "bulk of the interaction" between the officer and the suspect was monopolized by the unrelated inquiry. *Everett*, 601 F.3d at 494, 495.

Here, the traffic stop was never abandoned, and it was not completed until after Crawley, the owner of the car, gave consent to search the inside of the car. Lilly's undisputed testimony established that Crawley told Lilly he could search the "inside" of the car before Lilly issued the summonses to Allen. The relevant inquiry in this case, therefore, is whether Lilly "diligently" pursued the purposes of the traffic stop throughout the encounter, and if he did not, whether the prolongation was supported by independent reasonable suspicion.

---

[9] While the *Everett* court's opinion dealt only with *questioning* about matters unrelated to a traffic stop, its reasoning applies with equal force to canine sniffs. "[M]ere questioning" about unrelated investigative purposes is not a "seizure" and it does not trigger the protections of the Fourth Amendment. Questioning is justified by the principles applicable to consensual encounters, and it is therefore objectionable only if it unreasonably extends the duration of a separate seizure. *Muehler v. Mena*, 544 U.S. 93, 101 (2005); *Everett*, 601 F.3d at 496. Similarly, a canine sniff does not trigger the protections of the Fourth Amendment. *See Muehler*, 544 U.S. at 101 (canine sniff is "not a search"). Thus, like questioning, a canine sniff is unreasonable only if it unreasonably extends the duration of the stop. *See Illinois v. Caballes*, 543 U.S. 405, 408-09 (2005); *United States v. Bell*, 555 F.3d 535, 539 (6th Cir. 2009).

"Reasonable suspicion requires specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant the continued detention of a motorist after a traffic stop." *United States v. Smith*, 263 F.3d 571, 588 (6th Cir. 2001). The continued detention cannot be supported by an "ill-defined hunch," but instead requires "a particularized and objective basis for suspecting the particular person of criminal activity." *Bell*, 555 F.3d at 540 (internal quotations and alterations omitted).

Although Lilly admitted that a routine stop for failure to signal would have taken only about ten minutes, a traffic stop extended by reasonable suspicion for 30 minutes is not in itself unreasonable. *See*, *e.g.*, *United States v. Garcia*, 496 F.3d 495, 504 (6th Cir. 2007) ("[T]he duration of the stop was reasonable; the canine sniff was performed within a half hour of the stop"); *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005) (police had reasonable suspicion to detain suspect for 30 to 45 minutes to wait for the first drug-detection dog to arrive); *United States v. Orsolini*, 300 F.3d 724, 730 (6th Cir. 2002) (detention reasonable where investigation lasted less than one hour with some 35 minutes spent waiting for the canine unit to arrive)*; United States v. Avery*, 137 F.3d 343, 350-51 (6th Cir. 1997) (holding 25 minute delay during investigatory stop was reasonable); *United States v. Knox*, 839 F.2d 285, 290-91 (6th Cir. 1988) (holding 30 minute delay during investigatory stop was reasonable). A lengthy stop is more likely to be reasonable when, during the course of the stop, reasonable suspicion that criminal activity is afoot is "developing." *Hill*, 195 F.3d at 270-71. Any delay attributable to the "legitimate investigation" of the officer's reasonable suspicion is permissible. *United States v. Sharpe*, 470 U.S. 675, 687 (1985). At each step of the investigation, law enforcement officers may extend the detention if reasonably necessary to confirm or dispel their growing suspicions. *Id.* at 686, 688 (approving a lengthened detention as "the result

16

of a graduated response to the demands of the particular situation") (internal quotation and alterations omitted).

Lilly's actions were reasonable in light of these principles. When Lilly first approached the car, he proceeded with the routine traffic stop by informing Allen why he had pulled the car over. At that point, Lilly had developed several reasons to be suspicious: the men were traveling in a known drug corridor; he had observed Defendants quickly exit the interstate after he had pulled out behind them; he had observed that they did not appear to know which way to go at the bottom of the exit ramp, indicating they had made their decision to exit in haste; and he had seen the screwdriver, which along with the malfunctioning window suggested to Lilly that the car might have electrical problems indicative of a hidden compartment. These factors by themselves would not support a seizure, but they at least supported Lilly's decision to ask the men why they had exited. *See Everett*, 601 F.3d at 494 (noting that "context-framing" inquiries "will rarely suggest a lack of diligence"). During that conversation, Lilly's suspicions were heightened by two further observations: gas was not indicated at, or readily available at, the no reentry exit they took, they did not stop at a gas station, and the men were nervous and looking at each other before answering his questions.

Lilly continued to pursue the traffic stop, and he asked the men for their identification and registration. *See United States v. Wellman*, 185 F.3d 651, 656 (6th Cir. 1999) (records check is within the purpose of the traffic stop). He contacted dispatch to check those records and learned that Crawley was wanted on a weapons charge, albeit on a "no extradition" warrant. Crawley's record also included charges involving a possible escape. Allen's record included a drug charge and a flight charge. Lilly called for backup out of a concern for his own safety and began to write the summonses. There is no indication that waiting on backup caused any significant delay, but even

17

if it did, such delay would be reasonable given the men's criminal histories. When backup arrived, Lilly returned to the car with more "context-framing" questions for the men--specifically, where they had been traveling. Their story of the fishing trip was suspicious to Lilly because, as a fisherman, he was aware that the ponds and lakes were frozen over, and because Crawley could not remember the name of the lake where they had been fishing.

Because of the implausible story, Lilly decided to separate the men and ask them more specific questions. Again, this next step in the "graduated" investigation was reasonable in light of Lilly's articulable reasons for suspicion. *See United States v. Smith*, 601 F.3d 530, 542 (6th Cir. 2010) (implausible story provided support for officer's decision to separate suspects and check the story). The men's stories differed, and there were also strange similarities--gaps suggesting that the men had rehearsed their stories, but incompletely. The suspicion generated by comparing the stories further supported the prolonged investigation. *See id.* (inconsistent stories supported further extension of the stop). Immediately after he finished checking the men's stories against one another, he returned to his patrol car to finish the summonses. Before issuing them to Allen, he asked Crawley for consent to search, and he obtained a limited consent to search the "inside" of the car.

Based on the foregoing, I **CONCLUDE** that Lilly diligently pursued the purposes of the traffic stop, and to the extent his investigation also pursued other unrelated suspicions, I **CONCLUDE** that each step in that investigation was supported by his growing reasonable suspicion that criminal activity was afoot.

### C. Scope of the Consent

With respect to the issue of consent, Defendants argue only that Lilly exceeded the bounds of Crawley's consent by entering the trunk of the car. Where the Government seeks to base a search

solely on the suspect's consent, "the scope of the consent determines the permissible scope of the search." *United States v. Gant*, 112 F.3d 239, 242 (6th Cir. 1997). The bounds of consent are delineated not by the defendant's subjective intent or the officer's subjective understanding, but by an objective test: "what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). Here, Lilly asked for consent to search the car, and Crawley replied he could search the *inside* of the car. Crawley's qualified response cannot reasonably be interpreted as giving consent to search the entire car, however ambiguous it might have been as to the exact boundaries of the consent. Even Lilly admitted he believed Crawley's consent did not extend to the trunk. *Compare Jimeno*, 500 U.S. at 251 (holding consent to search car extended to trunk because the defendant "did not place any explicit limitation on the scope of the search").

I **FIND** Crawley's consent did not extend to the trunk, but that finding does not entitle Defendants to suppression. Defendants do not dispute Crawley's consent permitted Lilly to search the passenger compartment of the car. The credible evidence is that the brief search revealed a marijuana cigarette.[10] Consent was never revoked, and any delay between the time consent was given and the consensual search was completed was justified by the consent.

---

[10] Defendants argue there was no evidence confirming that the roach was marijuana for probable cause to search the trunk. To the contrary, Edwards testified credibly that based on his experience, he was certain it was marijuana. Furthermore, when Crawley explained that the roach was for his father's glaucoma, he appears to have confirmed the officers' conclusion it was marijuana. The drug dog's earlier failure to alert during a sweep around the vehicle, which took place after consent to search was obtained, does not negate this subsequently developed probable cause. *See United States v. Wickersham*, 344 F. App'x 155 (6th Cir. 2009); *see also Nagy v. Mone*, 2007 WL 4208368, at *2 n.2 (D.N.H. 2007) (where independent facts supported probable cause, "probable cause did not dissipate simply because the dog failed to alert.").

19

I **CONCLUDE** that the discovery of that marijuana cigarette, combined with Allen's hasty exit, Defendants' criminal histories, the somewhat inconsistent stories, the evidence that Crawley may have lied about losing his front license plate, and Lilly's suspicions about a hidden compartment in the door, gave Lilly probable cause to believe the car might contain further evidence of criminal activity. *See United States v. Mans*, 999 F.2d 966, 969 (6th Cir. 1993) (marijuana cigarette plus cash found in passenger compartment provided probable cause to search the trunk). Once officers have probable cause to search a vehicle for contraband, they may search any compartment or container in which it may be found, including the trunk. *Arizona v. Gant*, 129 S. Ct. 1710, 1721 (2009); *California v. Acevedo*, 500 U.S. 565, 580 (1991). Thus, I **FIND** that while the search of the trunk was not consented to, it was supported by probable cause.

### III. CONCLUSION

For the reasons stated above, I **RECOMMEND**[11] that Defendants' motions to suppress [Doc. 21, 27] be **DENIED**.

        s/Susan K. Lee
        SUSAN K. LEE
        UNITED STATES MAGISTRATE JUDGE

---

[11] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 59(b)(2) of the Federal Rules of Criminal Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).